UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,                           :

                                                    :

             v.                                     :

                                                    :          **DECISION & ORDER**

PPASSIM ELDER and WILBERT BRYANT,                   :          18-CR-92 (WFK)

                                                    :

                        Defendants.                 :
------------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:** On March 12, 2020, the United States of America filed a fourteen-count Superseding Indictment (the "Indictment") in this action. *See* ECF No. 230. Beginning on September 20, 2021, the Court presided over the jury trial of Ppassim Elder and Wilbert Bryant (collectively, "Defendants"). On October 1, 2021, the jury found Ppassim Elder guilty of Counts One through Thirteen, and Wilbert Bryant guilty of Counts Two, Seven, Eight, Nine, and Ten. The jury acquitted Ppassim Elder on Count Fourteen. Defendants now move pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts Two, Seven, Eight, Nine, and Ten of the Indictment, and pursuant to Federal Rule of Criminal Procedure 33 for a new trial. For the reasons set forth below, Defendants' motions are DENIED.

## BACKGROUND

On October 1, 2021, Defendants Ppassim Elder and Wilbert Bryant were convicted by a jury of (1) committing physical violence in furtherance of extortion and extortion conspiracy against Mahmoud and Hani Kasem, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight); (2) using, brandishing, discharging and causing the death of Hani Kasem through the use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)–(iii) and 924(j)(1) (Counts Nine and Ten); and (3) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Two). The jury also found Elder guilty of bank fraud conspiracy, in violation of 18 U.S.C. § 1349 (Counts One, Three, and Five); committing physical violence in furtherance of an extortion against Mohammed and Ibrahim Rabah, in violation of 18 U.S.C. § 1951(a) (Count Four); access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 1029(c)(1)(A)(i) (Count Six); conspiring to make false statements and making false statements, in violation of 18 U.S.C. §§

1

371 and 1001(a)(2) (Counts Eleven and Twelve); and aggravated identity theft, in violation of 18

U.S.C. § 1028A (Count Thirteen).  The jury acquitted Elder of the charge of obstruction of

justice (Count Fourteen).

On November 1 and 10, 2021, Defendants filed motions for acquittal and for a new trial

under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  *See* ECF Nos. 382 and 383.

First, Defendants claim there was insufficient evidence to find them guilty beyond a reasonable

doubt of Counts Two, Seven, Eight, Nine, and Ten.  Second, Defendants argue this Court's

decision to seat only jurors who had been vaccinated against COVID-19 violated their statutory

and constitutional rights.  The Court addresses each argument in turn.

## DISCUSSION

### I.       Rule 29 Motions

#### A.   Legal Standard

To grant a motion for acquittal under Rule 29, the Court must find the evidence was

legally insufficient to establish Defendants' guilt beyond a reasonable doubt.  Fed. R. Crim. P.

29; *see United States v. Teman*, 465 F. Supp. 3d 277, 291 (S.D.N.Y. 2020) (Engelmayer, J.).

"The question is not whether this Court believes that the evidence at trial established guilt

beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt."  *United States v. Mi Sun Cho*, 713

F.3d 716, 720 (2d Cir. 2013) (per curiam) (emphasis in original) (alteration and internal citations

omitted).  Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly

possible, the court must let the jury decide the matter."  *United States v. Autuori*, 212 F.3d 105,

114 (2d Cir. 2000) (alteration and citation omitted).  Indeed, it is not the role of the trial court to

"substitute its own determination of . . . the weight of the evidence and the reasonable inferences

to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (alteration in original) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citation omitted).

A defendant challenging a jury's guilty verdict "bears a heavy burden." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017), cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks omitted); *see also United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks omitted); *see also United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008). The evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted).

B. Application

The Government presented substantial evidence of Defendants' guilt on Counts Two, Seven, Eight, Nine, and Ten, including over 150 exhibits, documentary evidence, financial records, and the testimony of thirty-nine cooperating, expert, and lay witnesses. Based on this record, any rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. The Court therefore denies Defendants' motion for a judgment of acquittal under Rule 29.

i.     *Count Two – Bank Fraud Conspiracy*

Count Two of the Indictment alleged between July 2012 and August 2012, Defendants Elder and Bryant knowingly and intentionally conspired to execute a scheme and artifice to defraud TD Bank by falsely stating in an account-opening document Bryant was the beneficial owner of the account when in fact Elder was the beneficial owner of that account.

At trial, the Government presented witness testimony and bank records establishing the following set of facts. Elder first met Government witness Frederick McCoy in 2011 while they were incarcerated together on Rikers Island. Tr. 344-45. In the spring of 2012, Elder asked McCoy for permission to use a bank account in McCoy's name. Tr. 345-46. McCoy declined but connected Elder with Bryant, who was interested in committing the crime with Elder. Tr. 346-47.

In furtherance of the scheme, Bryant opened an individual checking account at TD Bank with a balance of $5.00. See GX 209A; Tr. 848-49. Approximately one month later, Bryant's account received a $32,000 wire transfer from an Oklahoma-based individual named Thomas Hardy. *See* GX 209B; GX 209C; Tr. 849-50. Shortly thereafter, Bryant made four cash withdrawals from the account, totaling $28,000. *See* GX 20B; GX 209D; Tr. 848-55.

At some point in 2012, Bryant had a conversation with McCoy, during which Bryant paid McCoy $1,000 in cash as a "finder's fee" for connecting Bryant with Elder. Tr. 347-48. Based on that conversation, McCoy understood Bryant and Elder had committed the crime. *Id*.

Other evidence introduced at trial showed that Elder and Bryant continued to engage in criminal banking activity. For example, Kristy Gabel, a former investigator with J.P. Morgan Chase Bank, testified an investigation into unauthorized withdrawals from the account of customer Amy Kronethal revealed Bryant was involved in a fraudulent takeover of the account in 2012. Tr. 724-38; GX 204. The investigation, which was supported by related bank records,

revealed Kronethal's account information was altered to include the phone number of Ahmad
Zahrieh (a Government witness and one of Elder's bank fraud co-conspirators) and the
incorrectly spelled email address of Wilbert Bryant.  Tr. 732-33; GX 204.  On August 17, 2012,
someone using Kronethal's account attempted to send $1,750 to Bryant.  Tr. 734-36; GX 204.
However, the user then cancelled that payment, Tr. 735-36, updated the account's email address
to Bryant's correct email address, Tr. 737; GX 204; GX 505, and again attempted to send him
$1,750 from the account, Tr. 736-37; GX 204.  This time, a JP Morgan employee cancelled the
payment due to the suspicious nature of the transaction.  Tr. 737-38.  Although Elder was not
identified in the bank records, the Government introduced evidence linking him to the fraudulent
bank activity.  Specifically, while both Zahrieh and Bryant were implicated in the scheme,
Zahrieh and Bryant did not know each other; Elder, however, knew both men.  Tr. 702.

The Government's evidence also showed Bryant's banking activity was
consistent with a pattern of bank fraud Elder committed with others.  For example,
Zahrieh testified he participated in a nearly identical bank fraud scheme orchestrated by Elder on
three occasions.  GX 200A-C; GX 203A-B; GX 205A-C; GX 701-1 – 701-3; Tr. 675-81, 694-96.
Government witness Mohammed Rabah also testified he too participated in a nearly identical
bank fraud scheme with Elder in late 2015.  In that scheme, Rabah's account, which he opened
for Elder's use, received $31,700 from a fraud victim who testified at trial he sent the money to
Rabah intending to purchase a car. GX 207B; Tr. 810, 816, 819-21.  When Rabah did not give
the money to Elder, Elder violently extorted Rabah and his brother, Ibrahim.  Tr. 883-87, 921-40.
More specifically, Elder threatened to kill Rabah, and went to Rabah's home and assaulted
Rabah's older brother to "send a message" to Rabah.  Tr. 884-87, 906, 934-35.

In addition, bank representatives from each of the financial institutions involved in the bank fraud conspiracies testified to the materiality of the false statements Defendants made about the bank accounts. Banks are required by law to know the identities of the individuals who will be using or controlling a bank account, and they rely on that information to determine whether to open an account for the applicant. *See, e.g.*, Tr. 649-53, 751-52, 826-29, 1091-93.

Defendants now claim the evidence presented at trial was insufficient for a jury to find Bryant conspired to commit bank fraud with Elder. Bryant Br. at 4-5, ECF No. 382. According to Defendants, the Government's evidence was insufficient because it failed to establish (1) Hardy wired money to Bryant's account under false or fraudulent pretenses, (2) Elder was the beneficial owner of the account, and (3) Elder received any of the funds transferred to the account by Hardy. The Court disagrees.

First, Count Two charges Defendants with conspiracy to execute a scheme and artifice to defraud a *financial institution*, not Hardy. Therefore, as the Court instructed the jury, to prove Defendants committed the crime charged in Count Two, the Government had only to prove Elder and Bryant conspired to defraud TD Bank or to obtain money under the control of TD Bank by means of false or fraudulent pretenses, representation, or promises. The Government was not required to prove a scheme to defraud Hardy. Defendants also claim there is "a lack of evidence that any fraud . . . occurred." Bryant Reply at 2. However, the Government introduced significant circumstantial evidence on which a reasonable jury could have concluded fraud occurred, including McCoy's testimony about putting Bryant in contact with Elder for the purposes of committing the fraud, the relationship between Zahrieh, Elder, and Bryant, and evidence of a pattern of nearly identical bank fraud schemes.

6

Second, Defendants ignore the evidence supporting an inference that Elder was the beneficial owner of the Bryant account.  Specifically, the Government introduced evidence showing McCoy connected Elder and Bryant for the purpose of committing bank fraud.  Tr. 345-48.  Bryant then opened an account in his own name, which soon after received a wire transfer from Hardy.  GX 209B.  Bryant then withdrew most of the funds from the account.  GX 209B; GX 209D; Tr. 848-55.  This behavior was consistent with a pattern of bank frauds the Government demonstrated at trial.  Bryant also paid McCoy $1,000 in cash, which McCoy interpreted as a "finder's fee" for putting Elder and Bryant in contact and which he saw as an indication that Bryant and Elder had successfully executed the bank fraud scheme.  Tr. 347-48.  Further, the Government introduced testimony and bank records from JP Morgan Chase that established Bryant and Zahrieh were associated with the same bank fraud scheme and Elder was their only connection.  Tr. 725-38; GX 204.  Viewing the evidence in the light most favorable to the Government and drawing all inferences in the Government's favor, this evidence is sufficient for any rational jury to find beyond a reasonable doubt that Elder was the beneficial owner of the Bryant account.

Third, whether Elder received funds from the Hardy transfer is of no consequence to the conviction under Count Two.  As an initial matter, the jury could permissibly infer Elder did receive those funds based on the evidence of Elder's pattern of bank fraud, in which he received funds from accounts held in other's names.  However, even if the jury had not so concluded, Elder was charged with and convicted of *conspiring* to commit bank fraud.  Accordingly, the Government had only to prove the existence of an agreement to commit bank fraud and the Defendant knowingly and willfully became a member of that conspiracy, not that the bank fraud was successful.  Tr. 1522-27, 1532-39; *see also United States v. Jackson*, 335 F.3d 170, 181 (2d

Cir. 2003) ("A member of a conspiracy is therefore liable for an act he agreed to and intended to commit in furtherance of the conspiracy regardless of whether he ultimately committed the substantive act").  In this case, the Government introduced substantial evidence Elder knowingly agreed with Bryant to commit bank fraud.

In sum, viewing the evidence in the light most favorable to the Government as this court must, the Court concludes there was overwhelming evidence presented at trial such that "any rational trier of fact" could have found the essential elements of bank fraud conspiracy beyond a reasonable doubt.  The Court therefore upholds the jury's verdict as to Count Two.

    ii.    *Counts Seven and Eight – Extortion Conspiracy and Physical Violence in Furtherance of Extortion*

Defendants challenge the sufficiency of the evidence with respect to Counts Seven and Eight.  However, Defendants ignore substantial evidence introduced at trial and restate arguments rejected by the jury.  For these reasons and for the reasons set forth below, the Court denies Defendants' motion for acquittal under Rule 29 with respect to Counts Seven and Eight.

Count Seven of the Indictment charges between approximately March 2017 and October 2017, Elder and Bryant knowingly and intentionally engaged in conspiracy to commit extortion.  Specifically, Defendants agreed to obtain money from Mahmoud and Hani Kasem by wrongfully inducing their consent by actual and threatened force, violence, and fear, in violation of 18 U.S.C. § 1951(a).  Count Eight relates to the same conduct and charges Elder and Bryant with knowingly and intentionally threatening to commit and committing physical violence against Mahmoud and Hani Kasem in furtherance of a plan to commit extortion, in violation of 18 U.S.C. § 1951(a).

Defendants contend there is insufficient evidence to find they "conspired to wrongfully obtain or take the personal property of another, or from the presence of another."  Bryant Br. at

5.  Defendants argue this is because the dispute between Mahmoud Kasem and Elder "was about their relationship and not about any property" and because "there was no personal property that was the object of the conspiracy." *Id*. at 5, 7.  Defendants have failed to satisfy their heavy burden of establishing the evidence "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Espaillet*, 380 F.3d at 718.

First, the Government provided substantial evidence Elder and Bryant extorted Mahmoud and Hani Kasem for money.  As Mahmoud Kasem testified, when he refused to let Elder use Garden Valley's bank account to wire money, Elder demanded approximately $40,000 to $50,000, which Elder claimed Mahmoud Kasem owed him from prior deposits into the store's account.  Tr. 108-10.  Because Mahmoud Kasem could not give Elder that amount, Elder threatened Mahmoud Kasem and his family.  Tr. 110-11 (discussing approximately fifteen to twenty threats from Elder, including threats to shoot Kasem in the leg and to damage his home). Ultimately, the evidence showed Elder hired Bryant and McCoy to extort Mahmoud Kasem at gunpoint to get $50,000 from Mahmoud.  Tr. 356-57 (testifying that Elder "expressed to us that a family member owed him some money and he wanted us to retrieve it" and that "it would be best if we went with a gun to put the fear of God in him.").  Despite Defendants' claim the extorted funds "did not involve a loan," Bryant Br. at 6, Mahmoud Kasem repeatedly testified the funds were understood to be a loan or investment.  Tr. 90, 146.  Regardless, the evidence at trial showed the object of the conspiracy was to get money from Mahmoud Kasem.  Based on this evidentiary record, the Court cannot conclude the evidence of conspiracy to extort and extortion of money "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Espaillet*, 380 F.3d at 718.

Defendants claim the dispute between Elder and Mahmoud Kasem arose in the context of "their relationship and [was] not about any property." Bryant Br. at 7. In support of their argument, Defendants cite "murky" evidence regarding the ownership of Garden Valley Distributors ("Garden Valley"), Mahmoud Kasem's conduct with respect to the funds, and the amount of revenue earned by Garden Valley. *Id.* at 5-6. But the ownership of Garden Valley and its weekly revenue are relevant, if at all, only for the purposes of the jury weighing the evidence and the credibility of the witnesses. Defendants then argue Mahmoud Kasem's text messages to Elder indicate Kasem was "unafraid" of Elder, and thus the dispute between them must have concerned their relationship, not any property. Bryant Br. at 7. This argument is also unavailing. Besides the fact the crime involved threatened force, Mahmoud Kasem also stated explicitly he feared Elder's threats. Tr. 111. Moreover, the cited text messages in no way preclude the dispute arising from a loan to or investment in Garden Valley.

Defendants then suggest to sustain a conviction for extortion, the object of the extortion conspiracy must have been lawfully possessed. However, "[i]t does not matter if the victim's initial acquisition or possession of the tangible property was illegal, or if the business in which the victim is engaged is illegal." Sand, Instruction 50-11; *United States v. Fazio*, 770 F.3d 160, 168 (2d Cir. 2014) ("[N]othing in the language of the Hobbs Act suggests that the fear of economic loss is somehow limited to the fear of economic loss to which the victim is legally entitled.").

Finally, Defendants' arguments with respect to Count Seven concern witness credibility and the weight of the evidence, the evaluation of which is the responsibility of the jury. The Court cannot "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129. Here, the

jury credited testimony the sole objective of the extortion conspiracy was to get money from Mahmoud Kasem.  The evidence introduced at trial was sufficient to support that conclusion; the Court therefore declines to disturb the jury's findings with respect to Counts Seven and Eight.

    iii.    *Counts Nine and Ten – Unlawful Use of a Firearm in Connection with Extortion and Causing Death Through the Use of a Firearm*

Counts Nine and Ten of the Superseding Indictment relate to the same conduct giving rise to Counts Seven and Eight.  Specifically, Count Nine charges Defendants with knowingly and intentionally using and carrying a firearm during and in relation to a crime of violence and possessing, brandishing, and discharging that firearm in furtherance of the crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)–(iii).  Count Ten charges Defendants with committing murder during that crime of violence in violation of 18 U.S.C. § 924(j)(1).

Defendants first claim because there was insufficient evidence of extortion, Count Nine must fail without a predicate offense.  The Court disagrees for the same reasons expressed in its analysis of Counts Seven and Eight, *supra*.

Bryant next argues there is insufficient evidence to establish he had dominion and control over the firearm used during the incident.  In support, Bryant claims (1) the gun went off by accident and (2) on the day of the murder, co-defendant Dwayne Ling did not show the gun to Bryant.  Bryant Br. at 8.  As an initial matter, the supposedly unintentional discharge of the gun has no bearing on Bryant's control of the firearm.  Bryant also ignores evidence he knew a firearm would be used in the charged offense.  Witness testimony revealed Elder told Bryant and McCoy to retrieve the money with a gun, Ling told Bryant and McCoy he was able to obtain a gun, Ling joined the scheme specifically because he had access to a gun, and Bryant knew Ling joined the scheme for that reason.  Tr. at 357, 365, 371.

Similarly, Defendants claim they could not have aided and abetted an 18 U.S.C. § 924(c) violation because they did not have "advance knowledge" the gun would be used in the commission of the crime.  Bryant at 8; Elder at 2.  This argument is unavailing.  The Government was required to prove beyond a reasonable doubt the Defendants had "advance knowledge that a confederate would use or carry a gun during the crime's commission." *Rosemund v. United States*, 572 U.S. 65, 67 (2014).  Advance knowledge "means knowledge at a time the accomplice can do something with it—most notably, opt to walk away."  *United States v. Robinson*, 799 F.3d 196, 200 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Rosemond*, 572 U.S. at 78).  Knowledge of the gun may exist before the underlying crime begins, but knowledge gained in the midst of the underlying crime is sufficient so long as the individual continues to participate in the crime and has a realistic opportunity to withdraw.  *See Rosemond*, 572 U.S. at 78 n.9 ("[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge.")

Bryant claims he did not have advance knowledge because while Ling told McCoy Ling had the gun on the date of the shooting, he did not show it to McCoy or Bryant on the way to Garden Valley.  Bryant Br. at 8; *see* Tr. at 368.  Elder, meanwhile, claims although he instructed Bryant and McCoy to use a gun in the extortion, he never confirmed they would actually use a gun.  Elder Br. at 8; *see* Tr. at 357 (showing testimony by McCoy that he and Bryant "told [Elder] we'll think about it," in response to Elder telling Bryant and McCoy to use a gun in the offense).

However, Defendants fail to show the evidence presented at trial was legally insufficient to establish their guilt beyond a reasonable doubt as required by Rule 29.  With respect to

Bryant, any reasonable juror could find the required advance knowledge based on the evidence. First, Elder told Bryant and McCoy "it would be best if [they] went [to retrieve the money] with a gun to put the fear of God in [Mahmoud Kasem]."  Tr. 357.  Second, McCoy testified he and Bryant discussed how to get a gun after speaking with Elder; McCoy then suggested asking Dwayne Ling.  Tr. 362.  Ling agreed to participate and told Bryant and McCoy he could bring a gun.  Tr. 365-66.  McCoy then testified that on the day of the murder, Bryant "knew why Ling was there": because Ling could obtain a gun.  Tr. 371.  Third, during the commission of the crime, Ling drew the gun and McCoy used it to pistol-whip Mahmoud Kasem.  Kasem, witness Rolando Mojica, and McCoy each testified the gun was visible in Ling's hand during the crime. Tr. 124, 255, 377.  Yet Bryant neither questioned the presence of the gun nor left the store.  Tr. 378-79.  In fact, Bryant stayed at his post, blocking the exit.  Tr. 378.  Bryant's decision to continue the offense after Ling drew the gun was corroborated by trial testimony and video surveillance from outside Garden Valley.  This evidence was sufficient to establish Bryant's advance knowledge a firearm would be used to extort Mahmoud Kasem and thus to sustain his conviction on this Count.  *See Robinson*, 799 F.3d at 201 (finding evidence the defendant did not abandon carjacking when co-conspirator pulled out a gun was sufficient to establish advance knowledge).

With respect to Elder, the evidence introduced at trial showed that Elder, "peeved off that his cousin was taking his time trying to get that money back to him," instructed Bryant and McCoy to use a gun during the extortion.  Tr. 357.  McCoy testified Elder paid him and Bryant $500 as a deposit and confirmed they knew the correct location and victim after they agreed to commit the extortion.  Tr. 357-63.  This evidence is sufficient to demonstrate Elder's "advance knowledge" and sustain his conviction even without Elder having corroborated McCoy and

Bryant had, and intended to use, a gun.  The jury chose to credit McCoy's testimony over Defendants' claims they did not know there would be a gun used in the offense.  The jury was free to do so.  *See Autuori*, 212 F.3d at 114 ("In a close case, where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.") (alteration and citation omitted); *see also United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993) (internal citations omitted) ("A conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. Any lack of corroboration goes to the weight of the evidence, not to its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal.") (internal citation omitted); *see also United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (holding the court "must defer to the jury's choice" about which inferences to draw because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence" (citations and internal quotation marks omitted)).

Defendants also argue their convictions for threatening and committing physical violence in furtherance of extortion cannot serve as the underlying felony for their convictions under 18 U.S.C. § 924(j).  Elder Br. 1; Bryant Br. 9-11.  Specifically, they claim the alleged offense does not constitute first-degree murder because extortion is not one of the prescribed predicate crimes for felony murder under 18 U.S.C. § 1111(a).  They also claim the alleged offense does not constitute second-degree murder because they did not act with malice aforethought.  Bryant Br. at 9.

The Court rejects these arguments.  Under 18 U.S.C. § 924(j), "[a] person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm,

shall if the killing is a murder (as defined in section 1111)," be punished.  A "murder" under 18 U.S.C. § 1111 is defined as "the unlawful killing of a human being with malice aforethought." The second-degree murder provision in 18 U.S.C. § 1111 encompasses felony murder.  *United States v. Regnier*, 44 F. App'x 524, 528 (2d Cir. 2002) (summary order) (citing *United States v. Thomas,* 34 F.3d 44, 48–49 (2d Cir.1994) for the proposition "malice aforethought," within the meaning of 18 U.S.C. § 1111, "may be found from the intent to commit *a felony.*") (emphasis in original).  In *Regnier*, the Court cited approvingly to the Sixth Circuit's holding that "18 U.S.C. § 1111's second-degree murder provision encompasses felony murder."  *Id.*  (citing *United States v. Pearson,* 159 F.3d 480, 486 (10th Cir.1998) ("[S]econd degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a).").[1]  Although extortion is not listed among the prescribed predicate crimes for felony murder in 18 U.S.C. § 1111(a), the Court finds the commission of such an offense sufficient to establish "malice aforethought" within the meaning of 18 U.S.C. § 1111. Accordingly, Defendants' convictions under Count Ten are properly supported by their convictions for threatening and committing physical violence in furtherance of the extortion of Mahmoud and Hani Kasem on a felony-murder theory.

## II.   Rule 33 Motions

---

[1] Defendants contend *Pearson* is inapposite because the underlying felony was not used to support a second-degree murder conviction.  However, the underlying felony in that case was robbery, which is one of the enumerated predicate felonies under 18 U.S.C. § 1111(a).  Thus, the *Pearson* court concluded robbery could not supply the malice aforethought for a second-degree murder charge, not because felonies cannot serve as predicates to second-degree murder, but because robbery is an underlying felony for first-degree murder.

Defendants also move for a new trial pursuant to Fed. R. Crim. P. 33 based on this Court's decision to seat only jurors who had been vaccinated against COVID-19. Defendants argue the decision to seat a fully vaccinated jury violated their rights under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 ("JSSA"), the Sixth Amendment right to a jury drawn from a fair cross-section of the community, and the Fifth Amendment right to Equal Protection. Because the Court acted within its discretion in excluding unvaccinated individuals from the jury, Defendants' motion is denied.

A. <u>Legal Standard</u>

After the jury renders a guilty verdict in a criminal case, Rule 33 of the Federal Rules of Criminal Procedure permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

In exercising its discretion, a court must be careful not to usurp the role of the jury and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *See id.* at 1414; *Teman*, 465 F. Supp. 3d at 292. "[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (quoting *Sanchez*, 969 F.2d at 1414); *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. After doing so,

"[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414.

The Court's Rule 33 authority should be used "sparingly" and only in "the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414). "[M]otions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

B.  Facts

By the fall of 2021, the United States—over a year and a half into the battle against COVID-19—had recorded over 43 million infections and 700,000 deaths. *See* Centers for Disease Control and Prevention, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#trends_dailycases_totaldeathsper100k (providing statistics as of October 1, 2021, the close of trial).  In New York City alone, the virus killed more than 34,000 residents and was infecting more than 1,500 individuals per day by the start of jury selection in this case.[2] *Id*. Hospitalizations, long-term disabilities, job losses, and business closings have profoundly reshaped the social order in the City and throughout the nation.

In the early months of the pandemic, immunity remained elusive, including for the justice system.  Courthouses and detention centers across the nation grappled with infections, delays, and rising costs.  Case backlogs clogged the courts, delaying the administration of justice and prolonging pre-trial detentions for criminal defendants. *See* Patrick Smith, *As the Nation's Courthouses Reopen, They Face Massive Backlogs in Criminal Cases*, NPR (July 14, 2021), https://www.npr.org/2021/07/13/1015526430/the-nations-courthouses-confront-massive-

---

[2] Throughout August and September of 2021, the CDC designated Kings County, where this Court sits, a county of high community transmission.  See *United States COVID-19 County Level of Community Transmission as Originally Posted*, Centers for Disease Control and Prevention, https://data.cdc.gov/Public-Health-Surveillance/United-States-COVID-19-County-Level-of-Community-T/8396-v7yb/data.

backlogs-in-criminal-cases.  As this Court knows well, these detentions at times turned

inhumane.  *See United States v. Griffin, et al.*, 1:18-CR-192 (ordering a report on the often

unsanitary and unsafe conditions in Brooklyn's Metropolitan Detention Center).  The unsanitary

conditions and the rapid spread of COVID-19 at the Metropolitan Detention Center ("MDC") in

Brooklyn, for example, have been well-documented.  *See* Metropolitan Detention Center,

Administrative Order No. 2020-14 (Sept. 14, 2021) (noting that by the start of trial,

approximately 400 inmates and 125 staff at the MDC had tested positive for COVID-19).

Pandemic-induced delays in the courts only worsened and prolonged these conditions.

In response, courthouses across the nation implemented safety protocols to facilitate the

administration of justice while protecting the health of interested parties, including "employees,

lawyers, litigants, jurors, contractors, law enforcement personnel, the press, and interested

members of the public."  *See* Health and Safety Protocols for Courthouses in the Eastern District

(May 27, 2021).  Courts reconfigured the physical layout of courtrooms, required temperature

checks, and conducted proceedings remotely.  *Id.*  The Eastern District's protocols required

temperature checks and screening questionnaires upon entering the courthouse, the use of face

masks and social distancing measures once inside, and courtroom reconfiguration and retrofitting

for proceedings.  *Id.*

While admirable and necessary, these protocols have their limits.  By themselves, face

masks, social distancing, and similar measures may be effective for small groups over short

periods of time, but fail to ensure the safety of large groups in close contact for sustained

periods.  Kasim Khan, *et al.*, *COVID-19 Indoor Safety Guideline*, https://indoor-covid-

safety.herokuapp.com/.  Yet principles of fundamental fairness require many of these larger

proceedings to occur in-person and without unnecessary delay.

Fortunately, courts soon found another ally in the effort to meet these standards: vaccines.  Since their introduction in late 2020, COVID-19 vaccines have dramatically reshaped the battle lines in the war against the pandemic.[3]  According to the CDC, the vaccines authorized by the FDA are effective in preventing serious outcomes of COVID-19, including severe disease, hospitalization, and death.  Centers for Disease Control and Prevention, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fvaccines%2Fcovid-19%2Finfo-by-product%2Fclinical-considerations.html.  Specifically with respect to the Delta variant, which was the dominant variant at the time of the *Elder* trial and which is more than twice as transmissible as previous strains of the virus, the vaccine shortens the length of time during which people spread the virus.  *See* Sara Reardon, *How the Delta Variant Achieves Its Ultrafast Spread*, NATURE (July 21, 2021).  The CDC has concluded the unvaccinated are "much more likely to get infected, and therefore transmit the virus."  Amelia G. Johnson, *et al.*, *COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence — 25 U.S. Jurisdictions, April 4–December 25, 2021*, Centers for Disease Control and Prevention (Jan. 28, 2022).

---

[3] Vaccination status affects the risk of transmitting COVID-19.  *See* Centers for Disease Control and Prevention, *Science Brief: COVID-19 Vaccines and Vaccination*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html ("Current evidence indicates that fully vaccinated people without immunocompromising conditions are able to engage in most activities with low risk of acquiring or transmitting SARS-CoV-2, with additional prevention measures (e.g. masking) where transmission is substantial or high.").  In fact, the primary cause of the spread of the virus now occurs among unvaccinated individuals.  *Id.* ("[A] growing body of evidence suggests that COVID-19 vaccines also reduce asymptomatic infection and transmission . . . . SARS-CoV-2 transmission between unvaccinated persons is the primary cause of continued spread.").

A New York State Department of Health analysis determined fully vaccinated individuals are at least 78% less likely to contract COVID-19 and 89% less likely to be hospitalized compared to unvaccinated individuals.  N.Y. State Dep't of Health, *COVID-19 Breakthrough Data*, https://coronavirus.health.ny.gob/covid-19-breakthrough-data.  For months now, these lifesaving inventions have been readily available to anyone over the age of five at no cost.  Centers for Disease Control and Prevention*, COVID-19 Vaccines for Children and Teens*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/children-teens.html?s_cid=11368:age%20limit%20for%20covid%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY21.

Against this backdrop, on August 26, 2021, the Court held a pretrial conference, during which it proposed seating only vaccinated jurors in the *Elder* trial.  Defendants objected; the Government did not.  The Court then determined to seat only vaccinated jurors, basing its decision on the factual findings memorialized in its September 3, 2021 order.  *See* Order, ECF No. 328.

On September 13 and 14, 2021, the Court conducted jury selection.  During voir dire, the Court asked each potential juror its extensive set of questions, supplemented by submissions from defense counsel and the Government.  The Court also asked each potential juror about his or her vaccination status.  Unvaccinated individuals were dismissed, some for reasons unconnected to their vaccination status.  Many vaccinated individuals were also dismissed for reasons unrelated to their vaccination status.  Notably, the Court took a "holistic" approach to determining whether potential jurors were qualified to serve.  Transcript of Jury Selection at 81.  While the Court excused unvaccinated individuals from serving on the jury in this trial, the Court did not excuse them from jury service in all cases.  Instead, unvaccinated individuals were

expressly instructed to "return to the jury assembly room" to "be considered for service in other cases as the jury clerk instructs." *Id*. at 20.  The Court emphasized these unvaccinated individuals might well serve in cases "that I'm involved with or another judge is involved with." *Id*.  However, in "this particular case . . . we will only have fully vaccinated jurors." *Id*.  The Court subsequently swore in an all-vaccinated jury.

The trial began on September 20, 2021 and was scheduled to conclude on October 8, 2021.  *Id*. at 22.  On October 1, 2021, the jury acquitted Defendant Ppassim Elder of obstruction of justice.  The jury also found Elder guilty of the other thirteen counts in the indictment and Wilbert Bryant guilty of each of the five counts with which he was charged.

C. Application

The Court declines to exercise its Rule 33 authority because Defendants' fair cross-section rights were not violated by the exclusion of unvaccinated individuals from the jury.

The Sixth Amendment to the United States Constitution guarantees the right of criminal defendants to a trial "by an impartial jury of the State and district wherein the crime shall have been committed."  The Equal Protection Clause of the Fifth Amendment similarly prohibits underrepresentation of minorities in petit juries, though it also requires animus.  *See United States v. Gelb*, 881 F.2d 1155, 1161 (2d Cir. 1989).  The JSSA codifies these rights in statute.  28 U.S.C. § 1861 (all federal court litigants have a right to a jury "selected at random from a fair cross section of the community in the district or division wherein the court convenes").

District courts possess "broad discretion" in empaneling a jury, absent a Constitutional or statutory violation.  *See generally United States v. Torres*, 128 F.3d 38, 43-44 (2d Cir. 1997); *see also United States v. Morales*, 185 F.3d 74, 84 (2d Cir. 1999) ("The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an

abuse of this discretion.") (internal citation omitted); *see also United States v. Tsarnaev*, No. 20-443, 595 U. S. ____, (2022) ("Jury selection falls particularly within the province of the trial judge whose broad discretion in this area includes deciding what questions to ask prospective jurors.") (internal citation omitted).  A district court's decision to excuse a prospective juror under 28 U.S.C. § 1866(c) is reviewed for an abuse of discretion, and even if the court errs, relief is only warranted if there has been "a substantial failure to comply with the provisions [of the JSSA]."  28 U.S.C. § 1867(d); *see also United States v. Williams*, 927 F.2d 95, 97 (2d Cir. 1991) (affirming conviction where jury clerk excused two jurors on hardship grounds before they were questioned by the court, stating, "even if the excuse of the two jurors was error, it was harmless error").

Claims jury selection procedures violate the fair cross-section requirements of the Constitution and JSSA are evaluated under the *Duren* framework.  *Duren v. Missouri*, 439 U.S. 357 (1979); *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986) (applying *Duren* to fair cross-section challenge in a civil action); *United States v. Elias*, 18-CR-33, 2022 WL 125721, at *2–3 (E.D.N.Y. Jan. 13, 2022) (Garaufis, J.) (applying the *Duren* test to cross-section challenges brought under the JSSA).  Under *Duren*, the movant must first establish a *prima facie* case for a violation by demonstrating:

> (1) That the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systemic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364.  If the movant satisfies this initial burden, the burden shifts to the non-movant to show that the violation was justified because "a fair cross section [would] be incompatible with a significant state interest."  *Duren*, 439 U.S. at 368.

In this case, Defendants fail to satisfy the first prong of the *Duren* framework. It cannot be said that unvaccinated individuals are a "distinctive" group because there are many reasons why a person may choose not to get vaccinated, membership in the "group" changes daily, and vaccination status is a poor proxy for individuals holding a particular point of view. *See Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2021 WL 5864427, at *4 (S.D.N.Y. Dec. 10, 2021) (Caproni, J.) (internal citations omitted); *see also United States v. Moses*, 19-CR-6074, 2021 WL 4739789, at *3 (W.D.N.Y. Oct. 12, 2021) (Wolford, J.); *see also* N.Y.C. Health, *COVID-19: Data*, N.Y.C. Health, https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#nyc. The group thus lacks "a basic similarity in attitudes or ideas or experience" that "defines and limits the group." *Moses*, 19-CR-6074, 2021 WL 4739789, at *3. Such a group is not identifiable "on the basis of some immutable characteristic," and "[t]here is nothing to suggest that the viewpoints held by the unvaccinated will not be adequately represented by the vaccinated." *Joffe*, 2021 WL 5864427, at *4 (citing *Lockhart v. McCree*, 476 U.S. 162, 175 (1986)); *see also Lockhart*, 476 U.S. at 174 ("[G]roups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes."). Nor can it be said that vaccinated jurors would only ever vote to convict defendants, as evidenced by the acquittal of Elder on the obstruction of justice count. The Court declines to overturn the jury verdict in this case based on unsubstantiated alleged violations of the Constitution and JSSA when Defendants failed to establish a *prima facie* case of such violations.

Even if Defendants had established a *prima facie* case of a fair cross-section violation, their challenge would still fail under the burden-shifting component of the *Duren* framework because "a fair cross section [would] be incompatible with a significant state interest." *Duren*,

439 U.S. at 368.  The state has a significant interest in safeguarding the health and wellbeing of courtroom participants by preventing the spread of COVID-19.  *See United States v. Elias*, No. 18-CR-33, 2022 WL 125721, at *6 (E.D.N.Y. Jan. 13, 2022) (Garaufis, J.); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest."); *see also Broecker, et al. v. New York City Dept. of Ed.*, *et al.*, 21-CV-6387 (E.D.N.Y. Feb. 11, 2022) (Matsumoto, J.) (declining to issue a temporary restraining order in part because the equities and the public interest, including "the importance of safeguarding the public health and safety . . . weigh heavily in favor of upholding the implementation . . . of the Vaccination Mandate.").  Vaccines "are an important and effective tool for furthering that interest." *United States v. Elias*, No. 18-CR-33, 2022 WL 125721, at *6 (E.D.N.Y. Jan. 13, 2022) (Garaufis, J.) (citing Jan. 10, 2022 Min. Entry, *CNS P'nrs v. City of New York*, No. 22-cv-00037 (E.D.N.Y.) (Donnelly, J.) (denying motion to temporarily enjoin the vaccination mandate for private employers in part because vaccination serves the "government's overriding interest in stemming the spread of the COVID-19 virus and protecting the public health")).  The state also has a significant interest in adjudicating cases promptly and reducing the backlog of cases straining the justice system.  *See United States v. Elias*, No. 18-CR-33, 2022 WL 125721, at *6 (E.D.N.Y. Jan. 13, 2022) (Garaufis, J.).  Empaneling unvaccinated jurors "would directly contradict those significant interests by increasing the risk of COVID-19 transmission and the potential for disruption during trial, and by further delaying this court's administration of justice." *Id*.  Thus, even if Defendants had established a *prima facie* case for a fair cross-section violation based on vaccination status, the Court finds the state's interest in protecting public health and facilitating the administration of justice outweighs and justifies any such violation.

Not only have Defendants failed to make the requisite showing under *Duren*, but the JSSA also grants the Court the discretion to exclude unvaccinated individuals from the jury in this case. Specifically, the JSSA permits the exclusion of a prospective juror on the ground their "service as a juror would be likely to disrupt the proceedings." 28 U.S.C. § 1866(c)(2). As noted above and as memorialized in the factual findings of the Court, ECF No. 328, the *Elder* trial was highly susceptible to disruption by unvaccinated individuals. The trial was set to occur in a single enclosed room for approximately three weeks, five days a week, while the Delta variant surged throughout New York City. The proceedings would require the participation of dozens of people, including twelve jurors, four alternate jurors, three prosecutors, a federal agent, a paralegal specialist, the Defendants, defense counsel, a court reporter, United States Marshals, technicians, law clerks, courtroom deputies, and the Court. Other portions of the trial, like jury deliberations, required potentially prolonged exposure in even more confined spaces.

In deciding to exclude unvaccinated individuals from this particular jury, the Court complied with the requirements of 28 U.S.C. § 1866. The D.C. Circuit considers the 28 U.S.C. § 1866(c)(2) exception to be "case-specific" rather than "generic." *United States v. Spriggs*, 102 F.3d 1245, 1253 (D.C. Cir. 1996). In fact, "[a]ny person excluded from a particular jury under [§ 1866(c)(2)] shall be eligible to sit on another jury if the basis for his initial exclusion would not be relevant to his ability to serve on such other jury." 28 U.S.C. § 1866(c). Jury selection in this case complied with these requirements. The Court excused unvaccinated individuals from serving on this jury in this case, which, due to its expected length and the conditions under which it would be held, posed a serious risk to the health of courtroom participants if exposed to the virus. However, the Court did not excuse unvaccinated individuals from jury service in all cases. On the contrary, the Court directed unvaccinated individuals to "return to the jury assembly

25

room" to "be considered for service in other cases as the jury clerk instructs," including cases "that I'm involved with or another judge is involved with." Tr. at 20.  The Court's determination to seat only vaccinated jurors in the *Elder* trial was limited to this particular case and thus complied with the requirements of 28 U.S.C. § 1866.

Introducing unvaccinated jurors would have created a substantial risk that at least one trial participant would contract COVID-19.  A COVID-19 infection among jurors during trial could have caused, among other things, delays, postponements, scheduling conflicts, and logistical complications.  Jurors would have been required to quarantine.[4]  Some jurors may have been dismissed, while others may have been hospitalized or worse.  Had the virus spread throughout members of the jury, the trial may have concluded in a mistrial for failure to seat the appropriate number of jurors.[5]  Even without dismissals, vaccinated jurors may have experienced reasonable fears related to serving alongside unvaccinated individuals.  *See Joffe*, 2021 WL 5864427, at *4–5.  These anxieties may have interfered with and distracted from jurors' performance of their civic duty.  *Id.*

These concerns are not hypothetical.  *See, e.g., Almanzar v. Kebe, et al.*, 1:19-cv-01301, Dkt No. 194 (excusing juror in Cardi B. defamation trial for COVID-19 symptoms).  In fact, during this very trial, the Court dismissed a juror experiencing COVD-like symptoms.  Tr. 869: 17-21; 871: 25 – 872: 5.  Other courts have similarly concluded seating unvaccinated jurors poses a serious risk of disrupting proceedings.  *See Rosario v. City of New York*, 1:18-CV-04023,

---

[4] At the time of trial, the CDC recommended fourteen days of quarantine after exposure.  Centers for Disease Control, *Quarantine and Isolation* (July 29, 2021), https://web.archive.org/web/20210902184801/https://www.cdc.gov/coronavirus/2019-ncov/your-health/quarantine-isolation.html.

[5] Estimates of Delta variant spread indicated that the R0 value – the  system developed to track the average number of susceptible people that each infected person is expected to infect – of between 6 and 7.  See UCHealth, *The Delta Variant*, https://www.uchealth.org/services/infectious-diseases/coronavirus-covid-19/the-delta-variant-of-covid-19/.  This rate of spread would have posed serious risks to a jury that had already lost two alternate jurors.

Dkt No. 366 (order overruling an objection to exclude unvaccinated jurors from trial, noting "the presence of unvaccinated jurors presents an undue risk of the spread of COVID-19 for vaccinated jurors and an undue risk of disruption to the trial . . . .  While there are protocols in place within the courthouse, the risk of unvaccinated jurors is that they may disrupt the procedures because they are more likely to catch COVID-19 outside of the courthouse."); *Joffe*, 2021 WL 5864427, at *4–5 ("jury service is a civic duty and, while it can be inconvenient, it need not increase the risk of being exposed to a deadly disease . . . .  Having unvaccinated individuals on the jury would pose a considerable and unnecessary risk of disruption of the proceedings."); *see also Elias*, 2022 WL 125721, at *2–3 ("The court concludes that excluding individuals who are not fully vaccinated against COVID-19 from the jury venire is a lawful exercise of its discretion.  This holding is intended to reduce the risk of COVID-19 transmission in the courtroom, to facilitate the administration of trials, and to help cure the backlog of trial-ready cases."); *see also Moses*, 2021 WL 4739789, at *3 (concluding that unvaccinated jurors would likely disrupt the proceedings); *see also United States v. Liberto*, No. 19-cr-0600, 2021 WL 4459219, at *8 (D. Md. Sept. 29, 2021) ("[A]sking the vaccination status of potential jurors is in keeping with this Court's policy in the face of the COVID-19 Pandemic.").

In evaluating the authority of the executive branch to regulate workplace environments in response to the pandemic, the Supreme Court recognized regulations are permitted when the features of a workplace pose a special danger.  *National Federation of Independent Business, et al. v. Department of Labor, Occupational Safety and Health Administration, et al.*, 595 U.S.___ (2022) ("Where the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible . . . .  So too could OSHA regulate risks associated with working in particularly crowded or cramped

environments.").  This Court selected jurors in the *Elder* trial and required them to enter and remain in a workplace for up to a month while undertaking the risks associated with working in the particularly "crowded and cramped environments" known as jury rooms.  This Court refused to subject its jurors to such close contact with the virus, which "poses a special danger" to citizens doing their civic duty: a duty that does not require them to risk their lives.

The Court thus acted within its discretion in concluding that seating unvaccinated jurors would likely disrupt the proceedings and in consequently seating only vaccinated jurors.

## CONCLUSION

Elder and Bryant killed one man.  This Court declines to let them add one or more jurors to their body count.  For the foregoing reasons, the Court DENIES Defendants' motions for a judgment of acquittal under Rule 29 and motions for a new trial under Rule 33.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 382 and 383.

**SO ORDERED.**

**s/ WFK**

_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: March 21, 2022
        Brooklyn, New York