UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,    :

                Plaintiff,    18 CR. 92 (WFK)

     - against -    :

PPASSIM ELDER,

           Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - -X

## SENTENCING MEMORANDUM ON BEHALF
## OF PPASSIM ELDER

### CORRECTED VERSION

Thomas H. Nooter, Esq.
FREEMAN, NOOTER &
GINSBERG
75 Maiden Lane, Suite 907
New York, NY 10038
(212) 608-0808
*Attorney for Ppassim Elder*


John. F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
(212) 619-3730
*Attorney for Ppassim Elder*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,      :

           Plaintiff,                     18 CR. 92 (WKF)

     - against -            :

PPASSIM ELDER,

          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - -X

**DEFENDANT PPASSIM ELDER'S
SENTENCING MEMORANDUM**

**PRELIMINARY STATEMENT**

**I.      BACKGROUND**

Ppassim Elder respectfully submits this sentencing memorandum 1) to strongly object to the Guidelines calculation proposed by the Probation Department in the "revised" Pre-Sentence Report ("PSR") dated December 29, 2022, and 2) in support of his request for a non-Guidelines sentence, which, in our view, is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).  Taking into account Mr. Elder' age, his young children, the time he already has spent in jail on this case under extraordinarily difficult circumstances (almost 5 years under the worst conditions most of us have seen in our careers), a non-Guidelines sentence and a substantial period of

supervision along with mental health counseling would be appropriate at this point in time for this defendant.

**An Overview**

Ppassim Elder is 43 years old.  He is another in a seemingly endless stream of young men who find themselves before this court or other federal courts for sentencing for offenses that could have and should have been avoided.  The narrative of Ppassim's life is like so many others we have come to see.  It could make us numb, but it doesn't, because we see potential in Ppassim and because we have hope for him, perhaps one of the most essential components of the human condition, for defendants (and their lawyers).  We need to have hope and possibilities because without them individuals such as Ppassim have nowhere to go.

II.    **OBJECTIONS TO THE PRE-SENTENCE REPORT**

Our objections to the PSR are listed by paragraph, noting the numerous areas of disagreement we have with the Probation Department's calculation of the advisory sentencing guidelines range to be applied in this case.

Paragraph 47: Mr. Elder completely denies that the alleged event with a baseball bat ever occurred. There was nothing to substantiate this claim and it was

2

(properly) not used at trial because of its tenuous connection to any actual extortionate conduct. This paragraph should be deleted and disregarded.

The three "obstruction of justice" allegations:

Paragraph 51: There is no evidence that the reference to calling the Kasem family was to do anything improper concerning whether they were pressing charges against Mr. Elder. The families had been friends and it would not have been obstruction of justice to merely find out whether they intended to blame the killing on Mr. Elder.

Paragraph 52: this alleged conduct, as testified to by McCoy, was the subject of count fourteen of which Mr. Elder was acquitted. There was good reason he was acquitted: there was nothing to substantiate the claims by McCoy, concerning his claims that Mr. Elder offered him money to tell the government that someone else was behind the extortion of Mahmoud Kasem and the killing of Hani Kasem.

Paragraph 53: Mr. Elder absolutely had no intention of threatening the prosecutor by congratulating him on the birth of a child. He had no information about where the AUSA lived and there is no way that any "threat" by mentioning the birth could have had any positive result for Mr. Elder. It is a completely wild stretch to

3

presume that the remark was intended as a threat, and this paragraph should be deleted from the PSR.

Objections to the Probation Department calculations of the Guidelines:

Objections to paragraphs 71 through 76
**Count Group 1**, relating to Bank Fraud and Access Device Fraud:

Paragraph 74: We object to the full four-point adjustment for "role in the offense" as there were not five or more participants in any one of the counts involving bank fraud or access device fraud: the indictment charged various bank fraud schemes in individual counts of the indictment (thereby providing for the possibility that multiple-count grouping could lead to a higher grouped Guidelines level or possible consecutive counts). The evidence presented at trial for each of counts one through five showed only that the defendant conspired with one other person. Note that it was never clear from the evidence how many others participated in the "access device" fraud which was based on a group of credit cards in other peoples' names (who were not alleged to have been co-conspirators). Neither U.S.S.G. § 3B1.1(a) or (b) would apply because both sections refer to "five or more participants" or activity that is "otherwise extensive," and no activity with respect to any of the individual counts was extensive. Therefore the adjustment should only be plus two points.

4

Paragraph 75: We object to the two-point adjustment for "obstruction of justice" in paragraph 75 because we object to all of the allegations of "obstruction of justice" related to defendant Ppassim Elder as already stated in the objections to paragraphs 51, 52, 53 and 67.

Paragraph 76: If the objection is sustained the Adjusted Offense Level of paragraph 76 would be 21 points.

Objections to paragraphs 78 through 93 in general:

Defendant Elder adopts and incorporates by reference the arguments made by co-counsel, Michael Hueston, on behalf of his client Wilbert Bryant, in his sentencing letter dated January 17, 2023, objecting to making the calculation of the extortion conspiracy two separate "groups" for Guidelines purposes (see Letter at page 2, objections to paragraphs 52 and 53). The unfortunate death of Hani Kasem was the result of a single extortion plot directed at his son, Mahmoud Kasem, and Hani Kasem was, in effect, an innocent bystander in the attempt to collect the debt incurred by Mahmoud Kasem. The result of this would be to remove one "unit" of the grouping calculation of paragraph 111 of the PSR, which as it stands would make no difference, but if adjusted based on the objections stated *infra* (resulting

5

in the two "groups" for 7(a) and 7(b) being equal, would remove one unit and therefore one adjusted offense level.

Objections to paragraphs 78 through 86

**Count Group 2**, relating to Extortion Conspiracy of Mahmoud Kasem [counts 7(a) and count 8 of the indictment]:

Paragraphs 79 and 82: we object because the threat of bodily injury (paragraph 79) is already incorporated in the statutory definition of the offense, 18 U.S.C. § 1951(a) and is duplicative of the commission of bodily injury (paragraph 82).

Paragraph 84: we object to the full four-point adjustment for "role in the offense" as there were not five or more participants: the evidence at trial showed that there were only four: Elder, McCoy, Bryant and Ling. Moreover the "activity" was not extensive, being limited to only making a loan or investment and the demand for repayment by threat of and use of force or violence. Neither U.S.S.G. § 3B1.1(a) or (b) would apply because both sections refer to "five or more participants" or activity that is "otherwise extensive," and no activity with respect to any of the individual counts was extensive. Therefore the adjustment should only be plus two points.

Paragraph 85: we object to the adjustment for "obstruction of justice" as stated above with respect to paragraph 75.

Paragraph 86: If sustained, these two objections would result in an adjusted offense level of 31.

Objections to paragraphs 88 through 93

**Count Group 2** (continued, or maybe meant to be Count Group 3, since there is no Count Group 3 identified in the PSR), relating to extortion conspiracy of Hani Kasem:

Paragraph 88: We object to the use of U.S.S.G. § 2A1.1 because the death of Hani Kasem (as terrible as that was) does not qualify as "first degree murder" as is required by U.S.S.G. § 2A1.1. NOTE that the referral section of U.S.S.G. § 2B3.2(c) [extortion] ONLY refers out, by "cross reference," of the extortion section for "murder under 18 U.S.C. § 1111" to "§ 2A1.1 (First Degree Murder)" As noted in U.S.S.G. § 2A1.1 the section only applies to "pre-meditated killing" or "the commission of certain felonies" (felony-murder, also discussed further in the Commentary to U.S.S.G. § 2A1.1, Application Note 2(B)), which does NOT include extortion. Moreover the cross-reference does NOT include "second degree murder" which has its own Guidelines section (2A1.2) or any of the other lesser forms of homicide in the section 2A portion of the Guidelines. Note that all of the

7

discussion in Application Note 2(B) only applies to "felony murder," which is a crime defined by 18 U.S,C. § 1111(a), and only include as predicate felonies "... arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary or robbery [or a pattern or practice of criminal activity not relevant here]." Finally, the second paragraph of the cross-reference section (§ 2B3.2(c)(2) does not apply because the death was not an "attempted murder.")

In the event that the Court does not agree that the "cross reference" to § 2A1.1 (First Degree Murder) should not be applied [because there was no "felony murder"], then as an alternative argument we adopt the argument made in the objections filed by co-counsel for co-defendant Bryant at page 4 of Mr. Hueston's letter to the Court dated January 17, 2023, calling for a downward departure pursuant to Application Note 2(B) to U.S.S.G. § § 2A1.1 (First Degree Murder) for death caused without the level of intentionality required for first degree murder (manslaughter, negligent homicide, etc.). On the facts presented at trial it is abundantly clear that the homicide resulted from a pure accidental firing of the weapon. While not absolving anybody of responsibility, it was clearly not the level of mens rea which would rise to second degree murder or manslaughter. Our

8

primary argument remains, however, that the cross reference to § 2A1.1 should not apply at all because there is no felony murder involved in this case.

Paragraphs 91 and 92: same objection as made for paragraphs 84 and 85 (obstruction of justice and role in the offense).

Paragraph 93, Because the cross reference to U.S.S.G. § 2A1.1 should not be applied because the killing was neither pre-meditated nor part of a felony murder as defined by 18 U.S.C. § 1111(a), the adjusted offense level should be the same as that for count 7(a) above, which if the other objections are sustained, would be 31 points.

Objections to Paragraphs 99 and 100:
**Count Group 4** (conspiracy to make false statements):

Paragraph 99 (obstruction of justice): same objection as for paragraphs 67, 75, 85, and 92.

Paragraph 100: if this objection is sustained the adjusted offense level would be 6 points.

Objections to Paragraphs 101 through 108
(Not identified as a count group): physical violence in furtherance of extortion:

Paragraph 102 and 104: The threat of violence and the commission of the violence duplicate one another and thus only one of these enhancements should be applied.

9

Paragraph 107: Same objection as before: no proof of five or more participants in the conspiracy or extensive activity: only two points should be applied for "leadership."

Paragraph 107: Same objection as before on "obstruction of justice."

Paragraph 108: if the objections are sustained the adjusted offense level should be 23 points.

Paragraph 111:
**Multiple Count Adjustment**:

(Following the somewhat illogical group identifications in the PSR):

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count Group 1 | 21 | 0 |
| Count Group 2 | 31 | 1 |
| Count Group 2 (second) | 31 | 1 |
| Count Group 4 | 6 | 0 |
| Count 4 | 23 | .5 |
| Total Number of Units | | 2.5 |

Paragraph 113: add 3 level per § 3D1.4, adding three levels):    3

Paragraph 114: Combined offense level:    34

Note that if the Court agrees that the two extortion "groups" were improperly divided, and that there should only be one "group" for the extortion

count (count seven), then the number of units would only be 1.5 and the final

combined offense level would be **33**.

<u>Objections to Criminal History Category</u>:

Paragraph 120:    As the sentence of jail was no more than five days (and

therefore less than 60 days), only one point should be awarded

for this conviction. (Note that the sentence was "1 year

Probation," 5 days jail credited, and a fine).

Paragraphs 123 and 124:

These were both misdemeanors on related conduct that resulted

in sentenced that were "merged" under New York Penal Law

§ 70.35[1] with the felony indeterminate sentences (which ran

concurrently) in paragraphs 121 and 122, where he was

sentenced to two to four years on March 10, 2005 and one-and-

---

[1]Section 70.35: Merger of certain definite and indeterminate or determinate sentences.
The service of an indeterminate or determinate sentence of imprisonment shall satisfy any definite sentence of imprisonment imposed on a person for an offense committed prior to the time the indeterminate or determinate sentence was imposed, except as provided in paragraph (b) of subdivision five of section 70.25 of this article. A person who is serving a definite sentence at the time an indeterminate or determinate sentence is imposed shall be delivered to the custody of the state department of corrections and community supervision to commence service of the indeterminate or determinate sentence immediately unless the person is serving a definite sentence pursuant to paragraph (b) of subdivision five of section 70.25 of this article [which only applies to assault charges]. [This is the version that applied prior to September1, 2017,]

a-half years to three years on March 3, 2006.  (On both felonies he was released from custody on December 24, 2007 and discharged from parole on March 23, 2009 – see paragraphs 121 and 122). He was sentenced on both misdemeanors ("definite" sentences of one year or less) on the same day, April 10, 2006. The Criminal Record sheet shows that on both charges he was "remanded without bail" because he was already serving the two concurrent felony sentences. Because both of the misdemeanor sentences "merged" into the prison sentences they no longer sentences of incarceration separate from the felony sentences into which they merged, and therefore only <u>one point</u> should be awarded for each of these convictions (since there is no custodial period over 60 days, pursuant to U.S.S.G. § 4A1.1(b).

Paragraphs 126 and 127:

If the objections stated above to the criminal history calculation is sustained by the Court, the resulting criminal history would be 11 points, and the criminal history category would be V (not VI).

12

Paragraph 156:   If all of the objections herein are sustained, the total offense level would be 33 and the criminal history category would be V, for an advisory sentencing range of 210 to 262 months.

## III.   THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE

Mr. Elder was convicted after trial of serious offenses.  While we disagree with the jury's verdict, we accept it as we must for present purposes.  As set forth (herein?) (in a separate submission), we take issue with the Probation Department Guidelines calculations as set forth in the PSR.

### A.  The Purposes of Sentencing in This Case Are Satisfied By A Non-Guidelines Sentence

18 U.S.C. § 3553(a) requires a court to impose a sentence that is reasonable, one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection."  Section 3553 (a)(2) states that such purposes are:

A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
B. to afford adequate deterrence to criminal conduct;
C. to protect the public from further crimes of the defendant; and
D. to provide the defendant with needed education or vocational training medical care, or other correctional treatment in the most effective manner.

The lengthy sentence requested in the PSR is not needed to deter Mr. Elder from future post-incarceration unlawful conduct. With respect to the need for a sentence to afford adequate deterrence to criminal conduct, we are confident that a sentence far less than that proposed in the PSR is sufficient but not greater than necessary to deter Mr. Elder after his release from whatever sentence the Court imposes. He realizes that he is still young enough to turn his life around and have a real life with his two young children, yet not so young that he can afford to waste any time in prison. As for the general concept of deterrence, there simply is no evidence that increases in sentence length reduce crime through deterrence.[1] "Three National Academy of Science panels, ... reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).[2] *See also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).[3] The von Hirsch analysis, commissioned by the British Home Office, examined penalties in the United States and in several

---

[1] Of course, deterrence works in the sense that there is less crime with a criminal justice system then there would be without one. But the question here is one of "marginal deterrence," i.e., whether any particular quantum of punishment results in increased deterrence and thus less crime.

[2] This article is available on Westlaw.

[3] A summary of the von Hirsch report is available at http://members.lycos.co.uk/ lawnet/SENTENCE.PDF.

14

European countries.  It concluded that the "correlations between sentencing severity and crime rates ... were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."  The reason for this is that potential defendants are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the manner one might expect.  Tonry, *supra,* at 28-29.  "There is generally no significant association between perceptions of punishment levels and actual levels ... implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms" Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

The Hon. Jack B. Weinstein reached this same conclusion in *United States v. Bannister*, 786 F. Supp. 617 (E.D.N.Y. 2011).  In *Bannister*, Judge Weinstein determined that specific deterrence is not accomplished by lengthy incarceration. Judge Weinstein concluded that in actuality, unnecessary and excessive prison sentences aimed at specific deterrence are likely to promote high rates of recidivism.  Judge Weinstein reasoned that during such prison sentences, a person is likely to lose positive and constructive family and social supports and gain

15

negative influences, and be precluded from employment and or rehabilitative opportunities.  Judge Weinstein noted further that where such prison sentences fail to include any meaningful rehabilitation, and involve harsh conditions, such as solitary confinement, risk of recidivism will increase.  This is likely what happened to Mr. Elder after serving the prison sentence imposed on him in State Court on March 10, 2005.

We agree with Judge Weinstein and the conclusions of the scholars that people generally do not consider in advance the consequences of their wrongdoing. Moreover, a non-Guidelines sentence it will show that the law can have some compassion and mercy and treat each defendant as an individual taking into account all the faults and frailties of their lives.

**B.  Analysis Of The 3553(a) Factors Strongly Supports A Non Guidelines Sentence Far Less than a range greater than 20 years.**

18 U.S.C. § 3553(a) additionally directs a sentencing court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the guidelines sentencing range and policy statements, the need to avoid unwarranted sentencing disparities among defendants involved in similar conduct with similar criminal history, and the need to provide restitution to any victim(s) of the offense.

16

Further, under 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  The directives of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), *United States v. Crosby*, 397, F. 3d. 103 (2d Cir. 2005), and § 3553(a) make clear that courts must consider all of the factors in § 3553(a), many of which the Guidelines either reject or ignore, or demand to an "extraordinary" degree.  Indeed, in some cases, the Guidelines clash outright with § 3553(a)'s primary directive: "to impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.

As the Second Circuit observed in *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008):

> it is the district court's particular trust to ensure the "uniform and constant" principle of the federal sentencing tradition, specifically, that "every convicted person [be considered] as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," [citing] *Koon v. United States*, 518 U.S. at 113.

17

*Jones*, at 182.  To secure the objectives of § 3553, a district judge must fully exercise his or her proper sentencing authority.  *See Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2463 (2007).

Finally, it has been observed that sentencing is not an exact science. Rather it is a "fluid and dynamic process." *Irizarry v. United States*, 553 U.S. 708, 715, 128 S. Ct. 2198, 2203 (2008) (citing *United States v. Vega-Santiago*, 519 F.3d 1, 4 (1st Cir. 2008) (*en banc*)).  Its aim should be to impose a sentence that is reasonable and fair and just given the facts of a particular case and the facts relative to the particular person being sentenced.  The overarching goal is to fashion a sentence that is sufficient, but not greater than necessary.  Finally on this point, it has been noted that:

> "[w]hile there are many compelling considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of human kind[,] … what it is like to be in trouble and in pain."

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

An analysis of the § 3553(a) factors in this case, to which we now turn, fully supports the imposition of a non-guidelines sentence for Mr. Elder.

### 1.  The Nature and Circumstances of The Offense

We acknowledge that Mr. Elder's offenses of conviction are serious.  Only a fool would say otherwise.  People can and did get hurt and one man killed,

18

although the evidence at trial did demonstrate that the death of Hani Kassem was unintentional.

## 2.  The History and Characteristics of Ppassim Elder

Like most defendants who come before the Court for sentencing Passim Elder has two parallel paths to the narrative of his life.  One path reflects his convictions in this case and his criminal history, which is serious.  The other path narrates his family ties and his loving family members who are concerned about him, who support him, who want to help him and who want to see him working and enjoying and loving his six- and eight-year-old children from outside prison walls.  His children ask about him every day.

Members of Ppassim's family have written to the Court.  Their letters are annexed hereto as Exhibit "1."  In their own simple words they present the other narrative path of Ppassim's life.  They speak of his dedication to his family, his children, his wife and siblings and other family members.  We ask the Court to consider this other side of Ppassim when imposing a sentence that is sufficient but not greater than necessary in this case.

There is more to the narrative of Ppassim's life than his offense conduct and prior involvement in the criminal justice system.  It is sad that Ppassim did not take full advantage previously of the love and support he has from his family, but he is

19

conscious of that now in a way that he had not been before.  Having and focusing

on his six- and eight-year-old children who need him in their lives can be a life-

altering event and help to shape and alter the trajectory of Ppassim's life.  There is

a great potential for that here.

### 3.  The Kinds of Sentences Available

This consideration is not really a factor in this case.  While a sentencing

court must consider all of "the kinds of sentences available" by statute, §

3553(a)(3), even if the "kinds of sentence ...  established [by] the Guidelines"

permit or encourage only prison, *see Gall v. United States*, 522 U.S. 38, 58-59, 128

S. Ct. 586, 602 & n.11 (2007).  Here, a non-guidelines sentence is permitted by

virtue of the advisory nature of the Guidelines.  That extended and excessive

incarceration in this case is not necessary to accomplish the purposes of sentencing

finds further support in the Congressional directive that in considering whether and

to what extent imprisonment is appropriate based on the § 3553(a) factors, a

sentencing judge is required to "recognize that imprisonment is not an appropriate

means of promoting correction and rehabilitation."  *See* 18 U.S.C. § 3582.

Additionally, 18 U.S.C. § 3553(a)(2)(D) directs a sentencing court to consider the

need for a sentence to provide a defendant "with needed educational or vocational

training, medical care, or other correctional treatment in the most effective

20

manner." In prison, Ppassim can continue his education so he can enter on a new and better path when he is released, which he hopes will not be so far that he cannot imagine himself enjoying and sharing in the lives of his young children.

### 4. The Guidelines Sentencing Range and Guidelines Policy Statements

### a. The Guidelines Generally:

The Supreme Court's decision in *Booker/Fanfan* requires sentencing courts to treat the Guidelines as one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). As the Supreme Court held, the now revised Sentencing Reform Act ("SRA") requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a). *Booker*, 125 S. Ct. at 757.

Our view further is that the Guidelines are entitled to weight no greater than that afforded to the other factors listed in § 3553(a). Any approach that automatically gives "heavy" weight to the Guidelines range comes perilously close to the mandatory regime found to be unconstitutionally infirm in Booker.

Judge Scalia explained this point in his dissent from Booker's remedial holding:

> [L]ogic compels the conclusion that the sentencing judge,
> after considering the recited factors (including the

> [G]uidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise - if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed - its opinion would surely say so.

*Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part). Likewise, if the remedial majority thought that the Guidelines range had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special weight to the Guidelines range relative to the other § 3553(a) factors would violate the Sixth Amendment. As Justice Scalia observed in his concurring opinion in *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 577 (2007), there can be no "thumb on the scales" in favor of Guidelines sentences. There is no presumption as to the reasonableness of the Guidelines sentencing ranges. *See Gall*, 128 S. Ct. 596-97. *See also United States v. Nelson*, 555 U.S. 350, 129 S. Ct. 890 (2009). Based on "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence greater than necessary" to achieve § 3553(a)'s purposes, even in a "mine run case." *Kimbrough,* 552 U.S. at 109-11, 128 S. Ct. at 575. As such, in each case a court must make an "individualized assessment" of the appropriate sentence "based on the facts presented" and the factors detailed in§ 3553(a). *Gall*, 128 S.Ct. at 597. Additionally, judges "may vary [from the Guidelines ranges] based solely on

policy considerations, including, disagreements with the Guidelines." *Kimbrough*, 522 U.S. at 101-02, 128 S. Ct. at 570 (internal quotations marks omitted).

In sum, a sentencing court must now consider all of the § 3553(a) factors, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and a judge "is not prohibited from including in that consideration the judge's sense of what is a fair and just sentence under all circumstances." *Jones*, 460 F.3d at 195. Further, as one district judge has noted, "the Guidelines may be tempered by compassion." *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.).

### b. The Purposes of Sentencing In This Case Are Satisfied By A Non-Guidelines Sentence:

The PSR has calculated an advisory Guidelines range far in excess of what is needed in this case. The sentencing range calculated in the PSR should not be followed because: (1) it is in error as set forth above; (2) it is far greater than necessary to promote the goals of sentencing and fails to give due consideration to all of the factors set forth in 18 U.S.C. § 3553(a); (3) it is the product of guidelines not based on empirical data; and (4) it fails to take into account the circumstances of Ppassim's life and the factors enumerated in 18 U.S.C. § 3553(a).

### c. The Horrible Conditions at the MDC Warrant Consideration

Of course, nothing in the Guidelines takes into account the absolutely horrendous conditions at the MDC throughout Ppassim's almost 5-year period of incarceration (he has been incarcerated at the Brooklyn MDC since March 5, 2018). First was the "blackout" in the dead of winter. That brought no heat, no lights, no warm food, no telephone calls to family and no legal visits. That was followed by the once-in-a-century Covid pandemic, which has lasted for over two years. In addition to bringing sickness and disease into the MDC in a way not seen in decades, it brought isolation, 23+-hour lockdowns that lasted weeks and months at a time, more cold food, little or no family contact and a shutdown of most inmate programs. The deprivation of family contact combined with the daily fear, anxiety and stress which the Covid pandemic brought to bear on the facility's inmates was more than a person – even an inmate awaiting trial, or now sentencing, should be required to bear. These were and are unprecedented factors which the Court may, and should, fairly take into account when fashioning a just sentence in this case.

The Second Circuit has recognized that harsh prison conditions are a factor to be considered in arriving at a just sentencing under § 3553(a). *United States v. Carty*, 264 F.3d 191, 196 (2d. Cir. 2001). Citing the conditions of the New York BOP pretrial facilities, judges in this Circuit have acknowledged that the

24

conditions constitute extreme punishment beyond what the law requires and that the trauma experienced by an inmate as a result of pandemic-related isolation and fear of infection can be the basis for a lower sentence. Several courts have granted downward variances at sentencing on the basis of the harsh conditions at local detention facilities both before and during the coronavirus pandemic. Even before the pandemic the MDC had been an extraordinarily difficult place to survive for inmates, with poor medical care at the top of the list of grievances and deprivations of all kinds and manner. Those conditions only worsened under Covid.

Ppassim has experienced significant punishment. The prison conditions that Ppassim has been subjected to since 2018, must also be duly considered in assessing "just punishment." Throughout this time at MDC Brooklyn, inmates have been on "lockdown" due to the COVID-19 pandemic. Such "lockdown" conditions meant that he was confined to his cell for approximately 23 to 24 hours per day, with limited showering and telephone contact with his family. At MDC Brooklyn, Ppassim endured multiple quarantines, in which he was detained under even more difficult conditions for two to three-week periods and longer. Further, the MDC environment is unstable and chaotic. Stress and anxiety levels are heightened because of fear of infection, the poor conditions, lack of family contact and the uncertainty that comes with "pre-trial" status. Certainly, the harsh and

25

brutal conditions that Ppassim has experienced while incarcerated, as a result of the pandemic, ought to be taken into consideration.

Incarceration during the pandemic is undeniably more punitive. As the Honorable Paul Engelmayer recently observed, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *U.S. v. Lizardi*, 11 Cr. 1032-55 (S.D.N.Y.) (PAE), ECF. No. 2523, at 7-8 (collecting cases) (releasing defendant with no underlying health issues, concluding that the combination of COVID, jail conditions, the short period left on his sentence, and other § 3553(a) factors constituted extraordinary and compelling circumstances).

At varying times at proceedings throughout the course of cases before it, this Court also has acknowledged the harshness of the conditions at the MDC. Quite frankly, there are no words to describe these conditions. In years past, such conditions were often described by clients incarcerated as being in third world prisons. Judges regularly gave credit in consideration of the harsh conditions of confinement clients endured in other countries. As Your Honor recently stated in regards to the conditions inside MDC, "This is a disgrace. It's an ongoing

26

disgrace." *United States v. Griffin (Rivers)*, 18-Cr-192 (WFK), as cited in https://www nydailynews.com/new-york/ny-brooklynfederal-jail-mdc-judge-william-kuntz-toilet-broken-20210727-dc676zcjvvefplbs3msszmfi6i-story.html.

Life is never intended to be easy while in prison.  However, Ppassim's incarceration experience has been far bleaker and harsher than "normal."  In *United States v. Cirino*, 19 Cr. 323 (S.D.N.Y.) (JRR), the Honorable Jed Rakoff varied downward from a 57 to 71 month Guideline Range to a 10-month sentence of incarceration, recognizing that, "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."  Likewise, in *United States v. Daniel Gonzalez*, 18 Cr. 669 (S.D.N.Y.) (JPO), the Honorable J. Paul Oetken, recounted the stark deprivations that inmates have experienced during the pandemic, and observed:

> And I do believe that because it has been harsher than a usual period, that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think that having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been.

Consequently, although Gonzalez was facing a Guidelines range of 78 to 97 months' imprisonment, Judge Oetken imposed a sentence of time served, which

was the equivalent of 28 months' imprisonment.  Like the defendants in *Cirino* and *Gonzalez*, Ppassim Elder has been held in the harshest of conditions for the duration of the pandemic.

Accordingly, we respectfully submit that in consideration of the brutal and harsh conditions Ppassim has had to endure over almost the last five years, along with all of the other mitigating factors presented, a non-Guidelines sentence is appropriate.

### 5.  The Need to Avoid Sentencing Disparities

Imposition of a non-Guidelines sentence in this case will not create any sentencing disparities, either nationally or locally.  On the contrary, imposition of a Guidelines sentence for Mr. Elder's offense conduct would be overly punitive.

### 6.  The Need to Provide Restitution

The need to provide some amount of restitution is not a significant factor in this case, although providing Ppassim an opportunity to work lawfully and productively at some point would allow for the possibility of some restitution.

### 7.  Reflecting the Seriousness of the Offense, Promoting Respect for the Law, Providing just punishment, Deterring criminal conduct, Protecting the public, and Providing vocational training

18. U.S.C. § 3553(a) requires courts to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect

for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training. The sentence we propose will satisfy all of these reasons for punishing a defendant.  All of these sentencing objectives can be attained by imposing a non-Guidelines sentence.  Here, a substantial sentence - - but a non-Guidelines sentence - - with a substantial period of supervised release is a sentence "sufficient, but not greater than necessary" and will help Ppassim to progress lawfully through the remainder of his life and allow him to be a present and real father to his young children.

## **CONCLUSION**

For all the foregoing reasons, we respectfully submit that the Court should sentence Mr. Elder to a non-Guidelines sentence.

Dated:      January 25, 2023 (CORRECTED January 26, 2023)
            New York, New York

                                        /s/
                                    Thomas H. Nooter, Esq.
                                    FREEMAN, NOOTER &
                                    GINSBERG
                                    75 Maiden Lane, Suite 907
                                    New York, NY 10038
                                    (212) 608-0808
                                    *Attorney for Ppassim Elder*

29

_____/s/_____
John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
(212) 619-3730
*Attorney for Ppassim Elder*